UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE

<u>Resource Management Company</u>

    v.                                    Civil No. 06-cv-366-JD

<u>Frank Gregory</u>

**REPORT AND RECOMMENDATION**

    Plaintiff Resource Management Company ("RMC") brought this breach of contract, fraud, and theft by conversion action in the New Hampshire Superior Court against Frank Gregory ("Gregory"). Defendant removed the matter to this Court (document no. 1). RMC has filed a motion for a preliminary injunction seeking to enjoin Gregory from spending any money paid to Gregory to which RMC claims entitlement (document no. 10). An evidentiary hearing was held on November 30, 2006. After careful consideration of the arguments and evidence presented, I recommend that plaintiff's motion for a preliminary injunction be denied.

<u>Background</u>

    At the November 30 evidentiary hearing, most of the facts relevant to my findings and recommendation in this matter were undisputed. I will recite those facts as established for

purposes of preliminary injunction, and identify where my findings resolve a dispute in the facts asserted by each of the parties.

On January 23, 2003, Benjamin C. Riggs, Jr., ("Riggs") a Rhode Island resident and sole proprietor doing business as RMC, a New Hampshire company, entered into a written "Purchase Agreement with Frank Gregory ("Gregory"), an attorney practicing in Oklahoma. Ex. 1. The Purchase Agreement called for RMC to "advance" Gregory $100,000 to cover his living, overhead, and litigation expenses for 67 cases in which he was representing plaintiffs in "Fen-Phen" litigation.[1]  Ex. 1 at ¶1.  In exchange for advancing Gregory $100,000, RMC was to receive the money advanced, and at least an additional $100,000[2] when and if the

---

[1] Although it was not presented in evidence, the Court is aware that Fen-Phen, the nickname of a drug touted for promoting weight loss, which was later alleged to cause cardiac problems or death in its users, has been the subject of numerous class action and other lawsuits against the pharmaceutical companies that produced it in various courts of this country.

[2] Riggs testified that the Purchase Agreement he entered into with Gregory, which was introduced into evidence at the hearing, established the following terms: If Gregory was able to make payment to Riggs within 12 months of the $100,000 advance, he would repay the original $100,000 plus a flat fee of $100,000, for a total of $200,000.  The Purchase Agreement further spells out that if the repayment did not occur within twelve months of the advance being paid, Gregory will accrue fees in the amount of $10,000 per month in addition to the $200,000 owed.  Ex. 1 at ¶4.

Fen-Phen litigation resulted in payment of attorney's fees to Gregory, for a total of $200,000. Ex. 1 at ¶4. In addition, RMC was to receive an additional $10,000 per month for every month beyond the first twelve months that passed until RMC was paid the entire amount owed. Ex. 1 at ¶4. While, according to the plaintiff, the amount due to RMC has increased quickly, following the formula outlined in the Purchase Agreement, to more than $500,000, Riggs pointed out at the hearing that he took a substantial risk in entering into the arrangement.³ If the

---

While defendant did not present evidence to the contrary regarding the intentions or understandings of the parties, he argued at the hearing that the contract does not explicitly mention a payment of $200,000 as an amount due if payment is made within the first twelve months after the advance, but calls for only a $100,000 total payment if payment is made within the first twelve months. I find that the Purchase Agreement, while not spelling out the total due explicitly, does provide for a "flat fee" equal to %100 of the advance amount. Ex. 1 at ¶4. I find that the Purchase Agreement distinguishes between the $100,000 advance and the $100,000 flat fee, which is "100% of the amount advanced," for a total of $200,000 owed if repayment is made during the first twelve months after the advance is made. Ex. 1 at ¶4. To find otherwise would mean that any time payment is rendered within one year of the original advance, RMC would make no money at all on the transaction and would, in fact, lose money on the interest it could have earned by not making the advance at all. This reading of the contract, therefore, does not make sense and I will construe the Purchase Agreement's language, to the extent it may be unclear, to be consistent with common sense results.

    ³In fact, the Purchase Agreement specifically states that Gregory "acknowledges that RMC may make a substantial fee on this

3

litigation were to prove unsuccessful, resulting in no monetary award, RMC would not be owed any money by Gregory.  If the litigation were to produce an amount of money less than the maximum amount authorized to be paid to RMC by the Purchase Agreement, RMC's return would be the lesser figure of what was paid, rather than what would have been due under the formula in the Purchase Agreement.  Ex. 1 at ¶1.

The undisputed evidence at the hearing was that, prior to the date the parties entered into the Purchase Agreement, Gregory had referred his 67 Fen-Phen cases to a law firm, Petroff & Associates ("Petroff"), for trial.  Gregory remained involved in the litigation.  For the referral, and for his efforts, Gregory was to receive one third of the 40% portion of the recovery that was to be paid toward attorneys' fees.  Accordingly, in acknowledgment of that arrangement, the Purchase Agreement called for one third of 40%, or 13 1/3%, to be paid to Gregory or, under the terms of the Purchase Agreement, to RMC until RMC was paid in full.  Petroff signed a document acknowledging RMC's interest in Gregory's portion of the attorneys' fees.  See Acknowledgment of Lien & Assignment, Ex. 2.

---

purchase of an assignment of a portion of the claim(s) due to the costs and risks involved."  Ex. 1 at ¶2.

During the course of the Fen-Phen litigation, a trust account for settlement was established, called the "Matrix." The plaintiffs who were willing to participate in the Matrix settlement continued to be handled by Petroff. Twenty-four of the original 67 Fen-Phen plaintiffs referred by Gregory opted out of the Matrix settlement, against Petroff's advice, and ceased to be represented by Petroff at all. Those cases returned to Gregory for representation. Petroff notified RMC in writing that it would no longer be receiving any funds from those twenty-four cases, or have any control over or knowledge of the status of those cases. Ex. 6.

Riggs testified at the hearing, and was not contravened, that the cases that had gone the Matrix route were resulting in very small payouts, often producing a recovery of 10% or less of what had been originally expected to accrue from those cases. In any event, Petroff, aware of RMC's interest in the fees, has placed all of the attorney's fees earned by Gregory, which equal 13 1/3% of the recovered amount, less the costs of litigation, into its trust account.[4] While Riggs asserts that Petroff is not legally bound to keep those monies in trust absent an injunction

---

[4] Riggs testified that he does not know how much money Petroff is holding in trust at this time.

issued by a court, he concedes that Petroff has been voluntarily keeping the money in question in the trust and has expressed its intention not to release the money to Gregory until RMC's interest in it has been resolved.

Riggs testified that the "real money" in the Fen-Phen litigation is turning out to be the monies paid or expected to be paid to the twenty-four opt-out plaintiffs, now represented solely by Gregory. The parties disagree as to whether or not Gregory is obliged to forward his entire fee, less costs of litigation, or whether RMC is only entitled to receive 13 1/3% of the total recovery, less costs of litigation – the percentage of total recovery anticipated by the Purchase Agreement which was entered into when the twenty-four "opt out" cases were still Petroff cases. While the parties dispute what percentage of monies recovered in the opt-out cases must be paid to RMC rather than to Gregory, the parties do agree that, at a minimum, the first 13 1/3% should go to RMC.

Plaintiff claims that the Purchase Agreement grants RMC a secured interest "on a portion of the proceeds of the lawsuits based at least in part on valid and binding contingency fee agreements with the [Fen-Phen plaintiffs] and a referral

agreement with the attorney of record, Petroff & Associates."
The Purchase Agreement makes clear that the agreement is "for an
interest in [Gregory]'s contingency fees or other fees or
reimbursements due or paid to [Gregory] in connection with [Fen-
Phen Plaintiffs'] lawsuits and not a loan."  Ex. 1 at ¶1.
Counsel for the defendant represented at the hearing that Gregory
has, in the last two weeks, established a trust account and is
depositing a "portion" of what he receives as fees in the Fen-
Phen cases, in an amount equal to the 13 1/3% of total recovery
after costs.[5]  Thus far, counsel represents that Gregory has
placed $54,000 into the trust, and anticipates adding another
$100,000 in the near future.[6]

---

[5]Defendant's counsel relies on language in the Purchase Agreement for the proposition that RMC is due only a "portion" of attorney's fees to support its position that only 13 1/3% need be paid, which states: "[Gregory] shall assign a portion of [his] claim to the proceeds of the lawsuits as listed and described below . . .."  The defendant further asserts that RMC's interest in the fees is limited to the third of total attorneys' fees originally bargained for by the parties.  The ultimate resolution of this disputed interpretation of the Purchase Agreement is not germaine to my determination of this matter.

[6]Riggs claims that although he accepted the representation of defendant's counsel regarding the creation of a trust as true, as of the time of the hearing, he had not received any documentation that the trust exists or has had money in any amount deposited thereto.  During the hearing, I orally granted plaintiff the right to immediately proceed with discovery interrogatories.  I presume that the defendant's answers to

While this was going on, Gregory was also involved in case-sharing, and ultimately, a dispute, with another firm, Bonham & Hudson ("B&H").  Gregory ultimately settled with B&H by paying them approximately $160,000, using funds that he had received as part of his attorneys' fees in several of the opt-out Fen-Phen cases.  None of the proceeds from those cases were forwarded to RMC.  The matter with B&H has apparently been fully resolved.

RMC requests that this Court grant a preliminary injunction prohibiting Gregory from spending or otherwise disbursing any of the funds he receives from any of the Fen-Phen cases, in order to protect its asserted "secured interest" in all of Gregory's receipts from the Fen-Phen litigation.  In essence, RMC is requesting that this Court enter a "freeze order" directing the defendant not to dispose of or convert any of the money he receives from the Fen-Phen litigation.  In support of the granting of this injunction, Riggs testified that Gregory had intentionally and knowingly deprived RMC of money to which it was entitled by averting monies owed to RMC to the settlement with

---

interrogatories, combined with the defendant's obligation to continue to apprise Riggs of any change in circumstances regarding matters that were the subject of interrogatories served by plaintiff will satisfy any questions Riggs may have regarding the existence of the funded trust.

8

B&H.  Further, Riggs alleged that Gregory attempted to convince Petroff to pay Gregory directly rather than to deposit Gregory's fees into a trust in acknowledgment of RMC's interest in the money.  Riggs testified that Gregory's alleged efforts to evade repayment of the money, Gregory's repeated unfulfilled promises to account for the status of and the monies received in the Fen-Phen cases, and retention of owed monies for his own use demonstrate that allowing the case to proceed without an injunction freezing Gregory's Fen-Phen income will result in severe and irreparable damage to the security interest held by RMC in that money.  Further, Riggs asserts that as the 67 Fen-Phen cases are only about 20% of Gregory's approximately 300 cases, the injunction will not cripple Gregory's business or ability to support himself.

## Standard of Review

Preliminary injunctive relief is available to protect the movant from irreparable harm, so that it may obtain a meaningful resolution of the dispute after full adjudication of the matter. Such a situation arises when some harm from the challenged conduct could not be adequately redressed with traditional legal or equitable remedies following a trial.  See Ross-Simons of

Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 18 (1st Cir. 1996) (finding irreparable harm where legal remedies are inadequate); see also Acierno v. New Castle County, 40 F.3d 645, 653 (3rd Cir. 1994) ("Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough.  The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.").  Absent irreparable harm, there is no need for a preliminary injunction.

Raising the specter of a defendant who might not be able to ultimately satisfy a judgment because he may not then have assets is not sufficient to demonstrate irreparable injury for preliminary injunction purposes.  See Micro Signal Research, Inc. v. Otus, 417 F.3d 28, 31 (1st Cir. 2005).  However, "where there is a strong indication that the defendant may dissipate or conceal assets," preliminary injunctive relief may be warranted. Id.

The purpose of preventing irreparable harm is to enable the court to render a meaningful disposition on the underlying dispute.  See CMM Cable Rep. v. Ocean Coast Props., 48 F.3d 618,

620 (1st Cir. 1995) (explaining the purpose of enjoining certain conduct as being to "preserve the 'status quo' . . . to permit the court, upon full adjudication of the case's merits, more effectively to remedy discerned wrongs."); see also Becton v. Thomas, 48 F. Supp. 2d 747, 753 (W.D. Tenn. 1999) ("'The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits.'") (quoting Stenberg v. Cheker Oil Co., 573 F.2d 921, 925 (6th Cir. 1978)).  The court's focus, therefore, must always be on the underlying merits of the case, and what needs to be done to ensure that the dispute can be meaningfully resolved.

   A preliminary injunction cannot issue unless the moving party satisfies four factors which establish its need for such relief.  See Esso Standard Oil Co. v. Monroig-Zavas, 445 F.3d 13, 17-18 (1st Cir. 2006) (discussing the requisite showing to obtain a preliminary injunction); see also Ross-Simons, 102 F.3d at 18-19 (explaining the burden of proof for a preliminary injunction). Those factors are:  "(1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movant] if the injunction is denied; (3) the balance of relevant impositions,

i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest." Esso Standard, 445 F.3d at 18.  This four factor test applies where, as here, the movant seeks a prejudgment "freeze order."  Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151, 157 (1st Cir. 2004) ("[F]reeze orders directed at unspecified assets typically are in the nature of preliminary injunctions.").  If the plaintiff is not able to show a likelihood of success on the merits, the remaining factors "become matters of idle curiosity," Esso Standard, 445 F.3d at 18, insufficient to carry the weight of this extraordinary relief on their own.  See id. (the "sine qua non of this four-part inquiry is likelihood of success on the merits") (internal quotation omitted).  Yet, "the predicted harm and the likelihood of success on the merits must be juxtaposed and weighed in tandem."  Ross-Simons, 102 F.3d at 19.  A "strong showing of likely success on the merits reduces, but does not eliminate, the showing of irreparable harm that plaintiffs must make to obtain preliminary injunctive relief."  Biogen Idec MA Inc. v. Trs. of Columbia Univ. in N.Y. 332 F. Supp. 2d 286, 289 (D. Mass. 2004).

### The Four Preliminary Injunction Factors

1.  ### Likelihood of Success on the Merits

Although the exact contours of the claims raised by RMC in its initial complaint have yet to be clearly identified, it has sued for money damages alleging a breach of contract, fraud, and theft by conversion against Gregory.[7]  During the hearing in this matter, counsel for the defendant acknowledged that RMC is entitled to recovery of at least some of the monies claimed pursuant to the contract entered into between RMC and Gregory. "[A]n admission by counsel of his clients' personal liability in open court is ample basis for determining that the other side is likely to prevail on the merits."  Micro Signal, 417 F.3d at 32–33.  And, while the admission was not evidence at the hearing, and may not therefore have very much significance in future proceedings before this Court, "it is enough to support the preliminary injunction."  Id. at 33.  Accordingly, I find that

---

[7] RMC's complaint includes, in addition to two breach of contract claims, three fraud claims and an allegation of theft by conversion.  Defendant has moved for a "more definite statement" of the claims (document no. 7).  While that motion has not yet been ruled on, I find that, at this time, RMC has at least clearly stated its claim for breach of contract and that the other claims arise out of the same series of events and transactions.  As I find that, at least, RMC is likely to succeed on its claims based on breach of contract, I need not address the likelihood of success on the claims in controversy.

RMC has met its burden of demonstrating a likelihood of success on the merits of at least its breach of contract claims.

2.   Irreparable Harm

The Supreme Court has held that, ordinarily, injunctive relief interfering with a debtor's use of his own property cannot be granted to a non-judgment creditor seeking money damages. Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc., 527 U.S. 308, 321 (1999).  The Court in Grupo Mexicano, however, also noted that this rule might not apply where a creditor holds or asserts an "equitable lien" on the defendant's property.  Id. at 326.

Here, RMC claims that it has a secured interest in Gregory's Fen-Phen fees, and has provided a Purchase Agreement acknowledging that interest.  Accordingly, it is arguable that the reasoning of Grupo Mexicano might not apply in this situation if RMC has a secured interest in the property that is the subject of the motion for injunctive relief, even if that property is money.  See Charlesbank Equity, 370 F.3d at 159 (finding that under Grupo Mexicano, a District Court has "no authority to issue a preliminary injunction preventing petitioners from disposing of their assets pending adjudication of respondents' contract claim

for money damages <u>where no preexisting lien or equitable interest [has] been claimed</u>" and finding that "it is at least arguable that the existence of a security interest . . . is a salient distinction." (emphasis added)).

    Here, RMC argues that it holds a security interest in all of the money Gregory receives as a result of the Fen-Phen litigation, and that therefore, RMC can demonstrate irreparable harm to its interests if Gregory is not enjoined from disposing of or otherwise spending the Fen-Phen fee money he receives prior to the resolution of this case. In support of this argument, Riggs alleges that Gregory has improperly converted money due to RMC to his own use, that he has expressed some intent to continue to do so, and that he has failed failure to be forthcoming regarding the status of the Fen-Phen cases, as well as Gregory's representations to Riggs that he has no assets.

    However, it was established at the hearing that the money in which RMC asserts a security interest, is equal to only one-third of the attorneys' fees in the 67 Fen-Phen cases.[8] That money is

---

[8]The Purchase Agreement introduced in evidence by the plaintiff in this matter establishes a security interest only in 13 1/3% of the cases, the portion foreseen at the time the Agreement was signed, when Petroff was representing all of the 67 Fen-Phen plaintiffs. What, if anything, is ultimately owed to RMC from the opt-out cases is not before this Court at this time,

already protected by trusts.  Gregory's portion of the proceeds from the Petroff cases are being held in trust by Petroff in direct response to their concerns for RMC's interest in the money.  Further, since the filing of the motion for injunctive relief, Gregory has begun to deposit the same third of attorney's fees received in the opt-out cases into a trust account.  Accordingly, it appears that all of the property of Gregory in which RMC can assert an arguable security interest is being held in trust, and is therefore not in any immediate danger of disappearing and becoming unavailable should RMC prevail on the merits in this case.  Therefore, any irreparable harm alleged by RMC is purely speculative, and based on RMC's concern that either Petroff or Gregory could fail to follow through with their current practices regarding the trust accounts.  "A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store."  Charlesbank Equity, 370 F.3d at 162 (citing Regan v. Vinick & Young (In re Rare Coin Galleries of Am., Inc.), 862 F.2d 896, 902 (1st Cir. 1988)); see also Matos v.

---

but for purposes of preliminary injunction, the evidence demonstrates that a security interest was only created in the 13 1/3% of the attorneys fees collected.  See Ex. 1.

Clinton Sch. Dist., 367 F.3d 68, 74 (1st Cir. 2004) ("Absent something that indicates a need for *immediate* relief, a plaintiff's request for a preliminary injunction ordinarily ought to be rejected." (emphasis in original)).  Because the money in question appears to be well-protected, there is no basis, at this time, upon which I can make a finding that irreparable harm will ensue if an injunction is not issued.  If the situation changes, and RMC discovers at some point in the future that the money in question is being disposed of by Gregory or Petroff in a manner that diminishes RMC's secured interest in the funds, RMC is free to renew its request for injunctive relief at a later date.

3&4. The Balance of Relevant Impositions and the Effect of the Court's Ruling on the Public Interest

Because I find that the plaintiff cannot show irreparable harm based on the facts presented, and a showing of irreparable harm is a necessary hurdle to obtaining preliminary injunctive relief, I find that no injunction can issue at this time.  A discussion of the balance of impositions or the public's interest in the issuance of an injunction is therefore unnecessary, and I decline to conduct an analysis of these two factors.

<u>Conclusion</u>

Because I find that RMC has failed to demonstrate that it will suffer irreparable harm absent the granting of the requested injunction, I recommend that the motion for a preliminary injunction be denied.

Any objections to this Report and Recommendation must be filed within ten (10) days of receipt of this notice.  Failure to file objections within the specified time waives the right to appeal the district court's order.  <u>See</u> <u>Unauthorized Practice of Law Comm. v. Gordon</u>, 979 F.2d 11, 13-14 (1st Cir. 1992); <u>United States v. Valencia-Copete</u>, 792 F.2d 4, 6 (1st Cir. 1986).

_____
James R. Muirhead
United States Magistrate Judge

Date:    December 5, 2006

cc:      Benjamin C. Riggs, Jr., pro se
         Michael D. Ramsdell, Esq.
         Mark Howard, Esq.